J-A26017-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| ALEX M. KEDDIE IV, IN HIS INDIVIDUAL CAPACITY AND DERIVATIVELY ON BEHALF OF CROSSETT INC., A PENNSYLVANIA BUSINESS CORPORATION | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : : | No. 104 WDA 2018 |
| JANET M. GREGORY, IN HER INDIVIDUAL CAPACITY AND AS PRESIDENT AND CHAIRMAN OF THE BOARD OF DIRECTORS OF CROSSETT, INC., AND DOUGLAS C. SMITH, IN HIS INDIVIDUAL CAPACITY AND AS VICE PRESIDENT OF CROSSETT, INC. | : : : : : : : : : | |

Appeal from the Order December 1, 2017
In the Court of Common Pleas of Warren County Civil Division at No(s):
No. A.D. 450 of 2012

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MURRAY, J.

MEMORANDUM BY SHOGAN, J.:                    FILED FEBRUARY 8, 2019

Alex M. Keddie IV ("Keddie"), in his individual capacity and derivatively on behalf of Crossett, Inc. ("Crossett"), a Pennsylvania Business Corporation engaged in trucking services, appeals from the order entered on December 1, 2017, by the Court of Common Pleas of Warren County finalizing this matter. We affirm.

The parties, Keddie, Janet M. Gregory ("Gregory"), and Douglas Smith ("Smith"), were employees and shareholders of Crossett. Trial Court Opinion, 12/23/13, at 5-6. At the time of litigation, Keddie served as Chief Executive Officer of Crossett. Gregory was the former President and Chairman of the Board of Directors of Crossett. Id. Smith was the former Vice President of Crossett. Id.

Initially, Keddie and Gregory owned the company jointly. Trial Court Opinion, 12/23/13, at 4. After prolonged conflict between the two, Gregory orchestrated a takeover of the company with Smith's help and fired Keddie during a July 23, 2012 shareholders' and Board of Directors meeting. Id. at 7-13. Keddie filed a Complaint for Declaratory Judgment on August 9, 2012, against Gregory and Smith, collectively ("Appellees"). Id. at 1-2. In Count I of the complaint, Keddie sought a preliminary and permanent injunction seeking, inter alia, invalidation of the actions taken at the July 23, 2012 meeting and reinstatement of Keddie to the Board of Directors. Id. at 2.

By order entered October 23, 2012, the trial court granted Keddie's motion for a preliminary injunction. Order, 10/23/12, at 1-2. The preliminary injunction granted Keddie the following relief: 1) reinstating Keddie as CEO of Crossett, retroactively to July 23, 2012; 2) reinstating Keddie to the Board of Directors of Crossett; 3) setting aside as invalid all actions taken at the July 23, 2012 stockholders' meeting, including the election of a new Board of Directors; 4) setting aside as invalid all actions taken at the July 23, 2012

Board of Directors' meeting; 5) reinstating the Board of Directors as it was constituted prior to the July 23, 2012 shareholders' meeting; 6) reinstating the officers of Crossett as they existed prior to the July 23, 2012 shareholders' meeting; and 7) delineating the right to vote the Employee Stock Ownership Plan ("ESOP") shares by restricting that right to the full Board of Directors only. Order, 10/23/12, at 1-2.

On January 22, 2013, Keddie filed a motion for summary judgment, seeking 1) an order making permanent the preliminary injunction, 2) damages by virtue of Keddie's position as a shareholder of Crossett, and 3) damages by virtue of Keddie's individual position with respect to Crossett. By order entered December 23, 2013, the trial court granted Keddie's motion for summary judgment in part and denied it in part as follows: 1) the October 23, 2012 preliminary injunction was made permanent; 2) the motion for summary judgment was granted as to liability for breach of fiduciary duty by Gregory but denied as to damages and as to Smith's breach of fiduciary duty; and 3) the motion for summary judgment was granted as to liability for breach of fiduciary duty by Gregory but denied as to damages and as to Smith's breach of fiduciary duty. Order, 12/23/13, at 1.

After partial summary judgment was granted, further discovery was conducted, pretrial motions were filed, and the parties reached a settlement agreement that was entered as an order of court on June 30, 2014. The June 30, 2014 order stated the case was to be marked "'settled and discontinued

with prejudice.' This court shall retain jurisdiction to enforce the settlement agreement and to take any action with respect to other pending matters." Order, 6/30/14, at 1. Smith and Gregory entered into substantially identical settlement agreements ("Settlement Agreements").[1] The purpose of the Settlement Agreements was to set forth the terms and conditions by which Keddie would purchase both Gregory's and Smith's stock ownerships in Crossett. Article II, Paragraph 2.2 of the Settlement Agreements set forth the Formula for "Determination of Purchase Price, Down Payment, Original Note Principal, Interest Rate, etc." Smith/Gregory Settlement Agreements, 5/1/14, at Article II, Paragraph 2.2.

Paragraph 2.3 of the Settlement Agreements provided for a one-time adjustment of the per-share purchase price and set forth the means by which the one-time adjustment of the per-share purchase price would be determined. Smith/Gregory Settlement Agreements, 5/1/14, Article II, Paragraph 2.3. The Settlement Agreements state that the adjustment would be based on the final per-share valuation for the calendar year ended December 31, 2013, of the shares of the common stock of Crossett held by the Company's ESOP. Id. Paragraph 2.3 further provides that the Vineyard

_____

[1] The purchase price as identified in Article II, Paragraph 2.1 of the respective agreements, differs. The purchase price for Smith was $239,154.00, and for Gregory it was $1,618,960.00. Smith/Gregory Settlement Agreements, 5/1/14, Article II, Paragraph 2.1. Furthermore, the Formulas included in Article II, Paragraph 2.2 of the respective Settlement Agreements differ, each reflecting the shares held by the individual. Id. at Paragraph 2.2.

- 4 -

Group, LLC ("Vineyard"), a valuation company that had been used by Crossett in 2011 and 2012 to conduct Crossett ESOP share valuations, would conduct the 2013 ESOP valuation. Id. In calculating the 2013 ESOP valuation shares, Vineyard was to use substantially the same procedures, methods, and reasoning in calculation that it had used for its 2011 and 2012 ESOP share valuations. Smith/Gregory Settlement Agreements, 5/1/14, Article II, Paragraph 2.3.

In November 2014, Vineyard issued its report on the 2013 valuation at $174.00 per share. Keddie disagreed with the valuation as performed by Vineyard. Despite his challenges to that valuation, however, Keddie filed the ESOP Form 5500[2] valuation. In his letter accompanying the filing of Form 5500, which Keddie signed as CEO and President of Crossett, he stated that the valuation was to be used by the trustee (Northwest Savings Bank) for purposes of ESOP distributions in 2014 only and for no other purpose. Trial Court Opinion, 9/2/16, at 3-4. Because Keddie was dissatisfied with the Vineyard valuation, he hired LitCon Group, LLC ("LitCon") to examine the Vineyard report to determine if it met the requirements of Paragraph 2.3 of the Settlement Agreements. Id. LitCon's report took exception to the

_____

[2] Testimony at the February 29, 2016 hearing established that Form 5500 is an annual report filed by the ESOP which is a public disclosure of plan assets. N.T., 2/29/16, at 178.

$174.00 per share set by Vineyard and set a value per share of $127.00. Id. at 4.

On March 26, 2015, Keddie filed a "motion to enforce settlement agreement". On April 15, 2015, Appellees filed a "motion to enforce the settlement agreement". A hearing on these motions was held on February 16, 17, and 29, 2016.

On September 2, 2016, the trial court granted Gregory's and Smith's motion to enforce the settlement agreement, and denied Keddie's motion. Keddie filed a notice of appeal on September 14, 2016, which was docketed with this Court at 1372 WDA 2016.

Because in previous court management orders the trial court had directed that "[a]ttorneys' fees and expenses shall be considered only after the pending motions are resolved," Gregory and Smith filed a motion to quash the appeal as interlocutory, because the motion for attorneys' fees and costs was still outstanding. Order, 5/12/15, at 1. Due to the issue of attorneys' fees and costs having been expressly reserved by the trial court, the appeal was deemed interlocutory, and this Court quashed the appeal. Order, 11/15/16, at 1; see Joseph F. Cappelli & Sons v. Keystone Custom Homes, 815 A.2d 643, 648 (Pa. Super. 2003) (Because the trial court specifically reserved the issue and because the right to attorneys' fees arose as a function of the rights determined in the underlying litigation, the trial court order was not final absent resolution of the attorneys' fees issue.).

On December 1, 2017, the trial court issued an order directing Keddie to pay Gregory's and Smith's attorneys' fees and costs in the amount of $255,009.96. On December 28, 2017, Keddie filed the instant appeal from the September 2, 2016, and December 1, 2016, orders. Keddie and the trial court complied with Pa.R.A.P. 1925.

Keddie presents the following issues for our review:

I.    Whether the trial court committed an error of law by accepting the Company's [Employee Stock Ownership Plan ("ESOP")] 2013 valuation to calculate the buyout amounts under the Settlement Agreements even though the author of the 2013 valuation admitted that his valuation did not comply with the [Conforming Valuation Requirement("CVR")] – i.e., it was not performed "substantially in accordance with the procedures, methods and reasoning used by the Company for its 2011 and 2012 ESOP valuations"?

II.   Whether the trial court committed another error of law by not only ignoring the plain language of the CVR, but also the undisputed evidence that the valuation company promised that its 2013 valuation would "use the same approach for 2013 and future years that was used for 2012"?

III.  Whether the trial court committed an error of law by using the 2013 valuation to value the Company to calculate the buy out amounts even though the valuation itself warned that it "should not be used for any purpose other than for ESOP purposes."

IV.   Whether the trial court committed an error of law by finding that any remedy for the 2013 valuation's failure to comply with the CVR was "impossible" because that valuation had been accepted for ESOP purposes?

V.    Whether the trial court erred by awarding attorney's fees and costs to [Appellees] when they are not the "prevailing party" as required by Article 14.1 of the Settlement Agreements, and further erred by not applying the lodestar analysis when determining the reasonableness of [Appellees'] request for attorney's fees and expenses?

Keddie's Brief at 4-5.

We first note that despite presenting five issues in his statement of questions involved as "I-V", in the argument section of his appellate brief Keddie presents a single issue identified as "I", and seven sub-issues identified as "A-G". Keddie's Brief at 31-43. Although he failed to file a brief compliant with Pa.R.A.P. 2119,[3] we will not find Appellant's issues waived. Keddie's inconsistent presentation of argument, however, hampers somewhat our ability to concisely address separately each issue as presented in his statement of questions. Thus, we will address together the first four issues Keddie proffers in his statement of questions involved.

In his first four issues on appeal, Keddie maintains that the trial court erred when it accepted the 2013 ESOP valuation to calculate the buyout amounts under the Settlement Agreements. Keddie's Brief at 31-41. Specifically, Keddie contends that the trial court erred in interpreting the CVR to allow the 2013 valuation to utilize procedures, methods, and reasoning not

_____

[3] In relevant part, Pa.R.A.P. 2119(a) provides: "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Appellate briefs must conform materially to the requirements of the Pennsylvania Rules of Appellate Procedure, and this Court may quash or dismiss an appeal if the defect in the brief is substantial. In re Ullman, 995 A.2d 1207, 1211 (Pa. Super. 2010); Pa.R.A.P. 2101.

substantially the same as those used in the valuations for years 2011 and 2012. Keddie's Brief at 31. Keddie asserts that:

> [a]s a matter of law, the trial court erred by disregarding the CVR's unambiguous requirement that the final 2013 valuation use the same procedures, methods, and reasoning in the 2011 and 2012 valuations. Instead, the trial court mistakenly read the CVR to permit the use of any professionally-prepared valuation to calculate the PPA even if the procedures, methods and reasoning used were indisputably changed from the prior years. The Settlement Agreements, however, unambiguously condition the acceptance of the final 2013 valuation needed to calculate the PPA on the CVR, which requires the valuation to be performed essentially and materially in conformity with the procedures, methods and reasoning used in the 2011 and 2012 valuations. Contrary to the CVR's plain language, the trial court's interpretation effectively wrote that essential protective covenant out of the Settlement Agreement.

Id. at 28. Keddie further argues that if the valuation company, Vineyard, had used valuation methods and reasoning consistent with those used in the 2011 and 2012 valuations as required by the CVR, Crossett's stock value in 2013 would have been $134 per share rather than the $174 per share as designated in the 2013 valuation. Id. at 29.

In reviewing a trial court's determination regarding a motion to enforce settlement agreements, this Court has held:

> [t]he enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is de novo and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record.

Step Plan Serv.'s, Inc. v. Koresko, 12 A.3d 401, 408 (Pa. Super. 2010) (internal quotations and citations omitted).  "Where a settlement agreement contains all of the requisites for a valid contract, a court must enforce the terms of the agreement."  Id. at 409.

This Court has explained the following with regard to interpretation of contracts:

> When interpreting the language of a contract, the intention of the parties is a paramount consideration.  In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.
>
> On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

In re Jerome Markowitz Trust, 71 A.3d 289, 301 (Pa. Super. 2013) (citation omitted).

- 10 -

Here, the language in the substantially identical Settlement Agreements provides, in relevant part, as follows:

> Article II
> Purchase Price
> 2.1   Purchase Price.   As consideration for the Purchased Shares, Keddie shall:  (a) at or before the Closing (as defined in Section 3.1) on the terms and subject to the conditions set forth in this Agreement, execute and deliver this Agreement and thereby become obligated to pay to [Smith/Gregory] the total purchase price (the "Purchase Price") of [Smith:  Two Hundred Thirty-nine Thousand One Hundred Fifty-four Dollars ($239,154.00);  Gregory:   One Million Six Hundred Eighteen Thousand Nine Hundred Sixty Dollars ($1,618,960.00)]; determined as provided in Section 2.2 below and subject to subsequent adjustment as provided in Section 2.3 below; and (b) execute and deliver the agreements and instruments hereinafter specified in Section 2.4.   The Purchase Price shall be paid in accordance with Sections 2.4 and 2.3 below.
>
> 2.2   Determination of Purchase Price, Down Payment, Original Note Principal, Interest Rate, etc.
>
> (a)    The Parties acknowledge and agree:  (i) that the Purchase Price recited in Section 2.1 above has been determined to equal the "[Net] Unadjusted Price" . . .of the following formula (the "Formula"), (ii) the Down Payment recited in Section 2.4(a) below has been determined to equal the "5% Down Payment" set forth [in] the Formula, (iii) the Original Principal Amount of the [Smith/Gregory] Secured Promissory Note has been determined to equal the "balance of the Purchase Price" set forth [in] the Formula, and (iv) the regular monthly installments of principal due under the [Smith/Gregory] Secured Promissory Note have been determined to equal said balance of the Purchase Price divided by thirty-six (36) as set forth [in] the Formula.
>
> * * *
>
> 2.3   Adjustment of the Purchase Price, Down Payment etc. The Parties acknowledge and agree that the Purchase Price, Down Payment, Original Principal Amount of the [Smith/Gregory] Secured Promissory Note and the regular monthly installments of principal due under that Note are subject once to adjustment,

- 11 -

upward or downward, based upon the final per-share valuation, for the calendar year ended December 31, 2013, of the shares of common stock of the Company held by the Company's ESOP. More particularly, Vineyard Group, LLC has been and shall be engaged by Crossett to perform, substantially in accordance with the procedures, methods and reasoning used by Vineyard for its 2011 and 2012 ESOP share valuations, a valuation of the outstanding shares of common stock of Crossett on a per-share, minority, non-marketable basis for ESOP purposes (the "2013 Per-Share Value") and to render a written "Report" setting forth Vineyard's analysis and conclusion, inter alia, as to the 2013 Per-Share Value. Notwithstanding any purported limitation set forth in the Report on the use of the conclusion as to the 2013 Per-Share Valued, the Parties agree that if the 2013 Per-Share Value concluded by Vineyard varies from the $138.00 per-share value used in Line 1 of the Formula set forth in Section 2.2(a) above, then for purposes of this Agreement:

> (1) The Purchase Price, Down Payment, Original Principal Amount of the [Smith/Gregory] Secured Promissory Note and regular monthly principal installments will all be recalculated by Keddie (who shall give written notice of such recalculation . . . to the other Parties and provide the replacement instruments described below): substituting the 2013 Per-Share Value into Line 1 of the Formula and calculating the new amounts of the entries on [the related Lines.]

Smith/Gregory Settlement Agreements, Article 2, Paragraph 2.1-2.3 (emphases added).

In its September 2, 2016 memorandum opinion, the trial court comprehensively summarizes the substantial testimony regarding the process used to determine the 2013 valuation as well as evidence presented by Keddie challenging that process. Trial Court Opinion, 9/2/16, at 1-10. Our review reflects that the trial court adequately and thoroughly addressed Keddie's four

issues and that it did not err in accepting the 2013 ESOP valuation conducted by Vineyard, as being consistent with what was required by Article Two, Paragraph 2.3 of the Settlement Agreements.  Although we adopt the detailed trial court's opinion on these issues as our own, we find the following statements by the trial court to be particularly relevant in disposing of Keddie's claims:

> It is significant that Paragraph 2.3 of the Settlement Agreements is clear that it is the ESOP valuation which is to be the base for any possible price adjustment for the purchase of shares by Keddie.  There is no reference to market value nor purchase value.  The testimony was uncontradicted that an ESOP share value calculation has to be conducted in accordance with certain professional standards set by the [American Institute of Certified Public Accountants ("AICPA")] for valuation engagements.  Litcon, in its analysis, did not adhere to the valuation engagement standards set by the AICPA but instead determined the value through the reasonable buyer and willing seller approach.  The Vineyard calculation was accepted by the independent accounting firm, BDO USA, LLP which found it to be in compliance with standards necessary for the filing of the IRS 5500 notice.  The Trustee, Northwest Savings Bank, also accepted the Vineyard valuation and paid plan participants the share value set forth in the valuation for the 2013 distributions.
>
> In his argument that Vineyard did not perform its valuation "substantially in accordance with the procedures, methods and reasoning used by Vineyard for its 2011 and 2012 ESOP share valuations", Keddie points out that five valuation methods and weightings were used in the draft report of Vineyard and four were used in the final report from Vineyard but that in the 2012 report, all five methods were used.  However, in the 2011 valuation only one of the five methods was used.  Testimony was clear that the evaluation is not a figure that can be calculated by pure mathematics. Instead, it necessarily involves a judgment call as to the relative weight to be given to various factors and as to the methods that will be compatible with the situation in which the company finds itself as of a particular date.  It appears clear that Keddie would have known this because he had examined both the

2011 report and the 2012 report and realized that the former had utilized only one valuation method, Net Asset Value, while the latter used five and yet he signed the Settlement Agreement which clearly paired the two valuations as being substantially in accord. From year to year Vineyard had to analyze the methods which would be applicable under the situation existing at the time. This was done in the 2013 valuation and, in fact, when Keddie disputed the valuation in the draft report which included all five methods, Vineyard then issued the final report omitting the discounted cash flow method. Yet, it did not result in any change in the final conclusion, i.e. that the shares were worth each $174.00. Keddie interprets this as being an evasive move by Vineyard to avoid using the Corporation's projections and the delayed capital expenditures. Vineyard counters that it omitted the discounted cash flow method because of the unreliability of the projections.

* * *

There was no dispute among experts that the determination of what methods to use in any given year on any given corporation is a matter of judgment and that an evaluator may select one or more or all of five methods and his decision could not be rejected on the basis of that election alone so long as he would abide by the AIPCA standards for determining value of ESOP shares. The valuation cannot be compared to an evaluation of market value or what Dowd referred to as what a "reasonable investor" would use in deciding upon a prospective investment. Keddie, with his business background and education would know when signing the Settlement Agreements that there is a subjectivity to ESOP valuations and, in fact, any valuations, and that reasonable, competent, experienced evaluators could disagree. Keddie's experts also testified as to the individual professional judgment and reasoning that goes into a valuation. Clearly, it is not a mathematical computation.

* * *

[T]he [c]ourt finds that the language of Paragraph 2.3 was chosen carefully by [Keddie], that, to a knowledgeable person such as Keddie, the language was clear and unambiguous and that the agreement has to be enforced in accordance with the terms used. Under those terms understood by Keddie, the valuation was to be determined by Vineyard with whom both parties were familiar, who knew the Corporation and its history and the parties involved and about whom there is no evidence that its evaluators would

have a reason to favor one party over the other. The valuation was performed substantially in accord with the 2011 and 2012 valuations.

Whether the valuation correct[l]y reflects market value, what a willing buyer would pay to a willing seller, is not the issue. This [c]ourt cannot compare Vineyard and Litcon reports and decide which is more likely to reflect the true value of the Crossett shares. The [c]ourt cannot insert into the Settlement Agreements a clause which would provide for either a market value valuation or an alternate arbiter of value nor can the [c]ourt modify the contract to provide that the ESOP valuation is not the determinative factor. In fact, if the [c]ourt ruled that the ESOP value set by Vineyard, reported as accurate to the IRS by the Corporation and Keddie, accepted by BDO and acted upon by the Trustee, Northwest Savings Bank in its issuance of payment for shares, would be invalid, the consequences would be disastrous and any remedy impossible. The [c]ourt cannot rule on the valuation of Crossett shares with no resultant effect on the ESOP shares because the figure to be established for the Crossett shares being sold from Gregory to Keddie is intrinsically tied into the ESOP share valuation. An ESOP evaluation is one that is required for a very specific purpose and has to abide by certain set standards set by regulations. It was never meant to be used for a market valuation but only to determine what ESOP shareholders were to receive for shares to be turned in. Despite it not ever having been intended to be used to determine the price of shares on the market, Paragraph 2.3 of the Settlement Agreements at issue provides that it is to be the standard for the purposes of the meeting of the minds between Keddie and Gregory and Smith in their unique transaction. That was the explicit, unambiguous decision of the parties to the agreement. It is not ambiguous, just ill-conceived in that it would necessarily expose the parties to a risk that they chose to accept.

Trial Court Opinion, 9/2/16, at 6-10.

Thus, the parties unambiguously agreed in the Settlement Agreements that the 2013 ESOP valuation would determine the price per share. Moreover, the 2013 valuation prepared by Vineyard was conducted "substantially in accordance with the procedures, methods and reasoning used by Vineyard for

its 2011 and 2012 ESOP share valuations." Smith/Gregory Settlement Agreements, 5/1/14, Article II, Paragraph 2.3. As noted by the trial court, testimony established that an ESOP share valuation must be conducted in accordance with certain professional standards and may vary from year to year, requiring utilization of professional judgment. The 2011 and 2012 valuations were not determined utilizing identical methods and reasoning, but were made based on professional standards by individuals utilizing professional judgment. By agreeing to the language in Paragraph 2.3 of the Settlement Agreements that the 2013 ESOP valuation would be calculated in the same manner as previous years, Keddie indicated his acknowledgment of and acquiescence to this process. Furthermore, the LitCon analysis did not adhere to the valuation standards; instead it improperly determined the value through a reasonable-buyer and willing-seller approach.

Thus, the trial court did not err in concluding that, pursuant to the language of Paragraph 2.3, the parties unambiguously agreed to use the 2013 ESOP valuation prepared by Vineyard in determining price per share for purposes of the buyout. Further, the trial court did not err in concluding that the 2013 ESOP valuation as prepared by Vineyard was consistent with the language provided in Paragraph 2.3 of the Settlement Agreements. Therefore, Keddie is entitled to no relief on his first four issues.

Keddie next argues that the trial court erred when it awarded attorneys' fees and costs to Smith and Gregory. Keddie's Brief at 41. Keddie again

asserts that the trial court erred in finding that the 2013 valuation met the requirements of the CVR, and thus, it was error to award attorneys' fees and costs to Appellees on this basis. Id. Keddie further contends that the trial court erred by not performing the required lodestar calculation to determine the reasonableness of the fees and costs claimed by Appellees. Id. at 42. Specifically, Keddie maintains that the trial court erred in conducting the lodestar analysis and

> failed to address the most important questions: was [Appellees'] request for payment of <u>over 652 hours</u> of attorney time, at hourly rates that significantly exceeded the applicable local rates, reasonable for a motion to enforce a settlement agreement that involved very limited discovery (only one deposition) and limited hearing time?

Id. at 42-43 (emphasis in original). Keddie asserts that had the trial court properly applied the lodestar analysis it would have reached the conclusion that Appellees' attorneys' fees and expenses are grossly excessive and unreasonable, even at the slightly reduced total amount of $255,009.96. Id. at 43. Thus, Keddie maintains that even if the trial court's finding that the final 2013 valuation met the CVR is upheld, the court's award of attorneys' fees should be reversed and the trial court directed to apply the lodestar analysis to determine reasonable attorneys' fees and costs. Id.

We previously determined that the trial court did not err in concluding that the final 2013 ESOP valuation met the criteria set forth in the CVR. Thus, Keddie's claim that Smith and Gregory are not entitled to attorneys' fees and

costs because the trial court erred in concluding that the 2013 valuation met the language outlined in the Settlement Agreements is without merit.

"Appellate review of an order of a tribunal awarding counsel fees to a litigant is limited solely to determining whether the tribunal palpably abused its discretion in making the fee award." Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 974 (Pa. Super. 2011). In general, "the manner by which attorneys' fees are determined in this Commonwealth, under fee-shifting provisions, is the lodestar approach." Krishnan v. Cutler Group, Inc., 171 A.3d 856, 903 (Pa. Super. 2017) (citing Krebs v. United Refining Co. of Pennsylvania, 893 A.2d 776, 792–793 (Pa. Super. 2006)). The lodestar is the product of "the number of hours reasonably expended on the litigation times a reasonable hourly rate." Id. The lodestar is "strongly presumed to yield a reasonable fee." Logan v. Marks, 704 A.2d 671, 674 (Pa. Super. 1997). A court has the discretion to adjust the lodestar fee in light of the degree of success, the potential public benefit achieved, and the potential inadequacy of the private fee arrangement. Id. Further, the lodestar "should be reduced in proportion to time spent on distinct claims which do not produce finding of liability. After finalizing the lodestar, the court may then apply a multiplier, i.e., enhancement." Braun, 24 A.3d at 975 (internal citation omitted).

In its December 1, 2017 opinion, the trial court thoroughly addressed this issue. As stated by the trial court, it:

- 18 -

reviewed each and every fee, cost, expense or other sum claimed by [Appellees] to determine whether it is appropriate for inclusion in an award. With respect to claims that are supported by documents in the nature of itemized bills or invoices, the [c]ourt has reviewed each and every line item and considered the propriety of each item. In so doing, the [c]ourt's touchstone was the law . . . , and the [c]ourt scrutinized the nature of the work, the amount of billable hours expended, the rates charges, and the individual performing the work, as well as any other considerations specific to a particular claim.

Trial Court Opinion, 12/1/17, at 5.

The trial court determined that Appellees' counsel's hourly rate was reasonable. The trial court explained:

[T]he [c]ourt finds that the legal work done by Attorney [Vicki Kuftic] Horne was complex. This is consistent with not only her own testimony but also the testimony of Attorney John Quinn, Jr. who was called as an expert on behalf of [Appellees]. Mr. Quinn also corroborated Attorney Horne's testimony that her hourly rate is relatively low for the sort of complex litigation she performed. The [c]ourt gives considerable weight to Mr. Quinn's opinion that Attorney Horne's hourly rate is reasonable. Mr. Quinn has been a litigator for many years in many courts, and he is the chief of the litigation department at the firm of Quinn, Buseck, Leemhuis, Toohey, & Kroto, Inc., which has its offices in Erie County. Litigators from this firm often appear before this [c]ourt.

[Keddie] presented evidence that attorneys with offices in Warren County typically charge a significantly lower hourly rate for a given case than that rate charged by Attorney Horne for her work on the instant case. [Keddie] would have the [c]ourt find that his simplistic comparison is dispositive. However, the [c]ourt finds that the nature of the legal work done and the skill and standing of Attorney Horne, as discussed above,[4] justify the

_____

[4] In addressing the qualifications of Attorney Horne, the trial court, earlier in its opinion, stated the following: "The instant case involves complex litigation over corporate share valuation techniques. Attorney Horne is highly qualified for such work. This is evidenced by her curriculum vitae, including her

difference. This is especially true in hindsight when one considers that Attorney Horne achieved a successful result.

Trial Court Opinion, 12/1/17, at 4-5.

Furthermore, the trial court reviewed the number of hours expended on the litigation to determine whether that number was reasonable. The trial court identified specific line items for attorneys' fees that it deemed unreasonable. Trial Court Opinion, 12/1/17, at 7-12. The total award for attorneys' fees was reduced by these findings. Next, the trial court found that all of the costs and expenses, as distinguished from attorneys' fees, requested by Appellees were reasonable and appropriate for inclusion in the overall award. Thus, we conclude that the trial court's analysis was consistent with the lodestar calculation and that it did not abuse its discretion in determining that award. Keddie's contention that the trial court erred by not applying the lodestar analysis when determining the reasonableness of Appellees' request for attorneys' fees and expenses lacks merit.

Order affirmed.

_____

membership in the Academy of Trial Attorneys of Allegheny County and service as president of that organization." Id. at 3.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/8/2019